JESSICA HOWARD LTD.,
Plaintiff—Appellant,

v.

NORFOLK SOUTHERN RAILWAY
CO., Norfolk Southern Corp.,
Defendants—Appellees,

M/V SKY LIGHT, Tower Bridge, her
engines, boilers, tackle, etc., K Line, K
Line Ship Management Co., Ltd., Ka-
wasaki Kisen Kaisha, Ltd., Direct For-
warding Co. Inc., Bridge Terminal
Transport Co., Defendants.

Docket No. 02–7305.

United States Court of Appeals,
Second Circuit.

Argued: Oct. 4, 2002.

Decided: Jan. 10, 2003.

Steven P. Calkins, Kingsley, Kingsley &
Calkins, Hicksville, NY, for the appellant.

Ilene J. Feldman, on the brief, Barry N.
Gutterman, of counsel, Barry N. Gutter-
man & Associates, New York, NY, for the
appellees.

Before: CARDAMONE, MINER, and
SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge.

Plaintiff-appellant Jessica Howard Ltd.
("Jessica Howard") appeals from a judg-
ment of the United States District Court
for the Southern District of New York
(Allen G. Schwartz, J.) holding that the
contract damages owed by defendant-ap-
pellee Norfolk Southern Railway Co.
("Norfolk Southern"), which has conceded
liability for the partial loss of Jessica How-
ard's shipment of ladies' garments during
their transit from Shanghai, China to
North Bergen, New Jersey, are, as a mat-

ter of law, limited to Jessica Howard's cost of acquiring the goods in Shanghai or $15,164.70. *Jessica Howard Ltd. v. M/V Sky Light*, No. 00 CIV. 6319(AGS), 2002 WL 362767 (S.D.N.Y. March 5, 2002). The district court did not resolve which of several potentially operative documents controlled Norfolk Southern's liability and instead determined that each of the four documents limited damages to the same figure. We hold that under the terms of one of these documents, the Norfolk Southern Intermodal Rules Circular # 1, damages cannot, as a matter of law, be measured by the value of the goods at the origin of the shipment. We therefore vacate the district court judgment and remand to the district court for further consideration of which document governs this dispute and what the proper measure of damages should be under the governing document.

## BACKGROUND

Appellant Jessica Howard, plaintiff below, contracted to have 4440 ladies' garments shipped via intermodal transport from Shanghai, China to North Bergen, New Jersey. The containerized goods traveled from China to the West Coast by ship and then to the East Coast by rail service provided by defendant-appellee, Norfolk Southern. Upon arrival, the shipment was missing 1243 garments. Jessica Howard initially sued multiple parties, but Norfolk Southern has since admitted liability for the loss, and Jessica Howard has voluntarily dismissed its claims against all defendants except Norfolk Southern.

In the district court, both parties moved for summary judgment on damages. They agree that Norfolk Southern's liability is governed by contract documents generated in connection with the shipment, but they disagree about the extent of this liability. Norfolk Southern claims that its liability is limited to $15,164.70, the alleged cost of acquiring the goods at the shipment's origin in Shanghai; Jessica Howard claims that the amount is $62,142.00, the alleged actual market value of the goods at destination, plus interest and costs.

In its March 5, 2002 Order, the district court directed entry of judgment against Norfolk Southern in the amount of $15,164.70. The district court noted that four documents, each potentially impacting Norfolk Southern's contractual liability, were generated in conjunction with the shipment. Direct Forwarding Co., Inc., a freight forwarder, issued a Combined Transport Bill of Lading [1] (the "DFC Bill of Lading"). K Line, the ocean carrier of the shipment, issued a separate bill of lading (the "K Line Bill of Lading"). Norfolk Southern used its Intermodal Rules Circular # 1, dated June 1, 1999 (the "Circular"), to govern its liability during its segment of intermodal shipments in general. Finally, the district court found there was "some evidence" that Norfolk Southern issued an "edi waybill" in connection with the Jessica Howard shipment.

Although the parties disputed which of these documents controlled Norfolk Southern's liability, the district court did "not resolve that question ... because the result [was] the same under any of" them and held that Norfolk Southern's liability is limited to Jessica Howard's cost of ac-

---

**1.** A bill of lading, also known as a waybill, "is a receipt given by the master of a ship acknowledging that the goods specified in the bill have been put on board" and "is the document [that] contains the terms of the contract for the carriage of the goods agreed upon between the shipper of the goods and the shipowner." William R. Anson, *Principles of the Law of Contract* 380 (Arthur L. Corbin ed., 3d Am. ed.1919), *quoted in* Black's Law Dictionary 159 (7th ed.1999).

quiring the lost goods in Shanghai "regardless of which document governs." The district court left open whether the "edi waybill" existed and whether certain documents incorporated the terms of others; instead of resolving these disputes as a matter of law or leaving them for trial, it determined that under any possible factual scenario, only two liability provisions could apply—the provision in the Circular or the provision in the K Line Bill of Lading[2]—and that both measured damages by the cost of acquiring the goods in Shanghai.

The Circular offers two liability options, "Standard" and "Carmack";[3] the district court determined, and the parties do not dispute on appeal, that the Standard terms apply as Jessica Howard never opted into the Carmack regime. In the "Standard Liability Provisions and Restrictions" sec-

tion, the Circular provides that Norfolk Southern's liability:

> [W]ill not extend beyond the actual physical loss or damage to the cargo itself, plus any costs reasonably incurred in efforts to mitigate the loss or damage. [Norfolk Southern] will not be liable for attorney's fees …, for interest, or for special, consequential, indirect or punitive damages. Unless amended …, [Norfolk Southern's] liability for loss, damage or delay to any shipments under this circular shall be limited to the lesser of the destination value of the cargo or $250,000.

The district court interpreted the "actual physical loss" to be Jessica Howard's cost of acquiring the goods in Shanghai,[4] and noted that "the parties agree[d that the cost of acquisition] is $15,164.70."[5] It rea-

---

**2.** The district court held that the Circular used its own terms, that the "edi waybill" (if it existed) incorporated the terms of the Circular, that the DFC Bill of Lading incorporated the terms of the Circular, and that the K Line Bill of Lading might either apply its own terms or those of the Circular. (The K Line Bill of Lading incorporated the terms of an "original bill of lading" if such a bill of lading existed, and the DFC Bill of Lading—which incorporated the terms of the Circular—might be an "original" bill of lading.) The parties continue to dispute on appeal which document governs and which documents incorporate which others, but neither party proposes governing terms other than those in the Circular or the K Line Bill of Lading.

**3.** The Circular's "Carmack" provision incorporates the "traditional, common law [rail] carrier liability as codified in 49 U.S.C. § 11706." Section 11706 is the codification of the 1906 Carmack Amendment, which amended the Interstate Commerce Act of 1887, to "provide[] certain minimum terms below which a [rail] carrier could not limit liability." *Consol. Rail Corp. v. Sobiech,* 710 F.Supp. 988, 989 (S.D.N.Y.1989). *See generally Project Hope v. M/V IBN SINA,* 250 F.3d 67, 73 n. 6 (2d Cir.2001) (describing the Carmack Amendment).

**4.** Jessica Howard argues that the district court construed the Circular to fix liability at "the destination value of the cargo" and then measured this liability by Jessica Howard's net invoice cost. To the contrary, the district court correctly determined that "the reference to destination value is an indication of the maximum liability [Norfolk Southern] will incur," and interpreted the phrase "actual physical loss" to be the operative provision.

**5.** Based on the record before this Court, we note our concern about whether the parties in fact "agree" that Jessica Howard's acquisition cost in China was $15,164.70. Norfolk Southern provided this figure in a Local Rule 56.1 statement, claiming it was determined "pursuant to the stipulation of the parties," without citation to the record. Jessica Howard denied this stipulation in its responding Local Rule 56.1 statement. If no valid stipulation exists, a Local Rule 56.1 statement "by counsel on a motion for summary judgment cannot be a substitute for an affidavit as to the facts." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (quoting *Zanghi v. Incorporated Vill. of Old Brookville,* 752 F.2d 42, 47 (2d Cir.1985)) (internal quotation marks omitted). "The local rule does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule

soned that the Carmack terms limit liability to the fair market value of the lost goods at destination, and that measuring liability under the Standard terms by value at destination "would render the standard liability option meaningless." It also noted that the Standard terms expressly excluded consequential damages. Because lost profits are a type of consequential damages and because measuring Jessica Howard's loss by the destination value of the garments would compensate for lost profits, the district court determined the Standard terms could not measure "actual physical loss" by the destination value of the lost goods.

The district court held that the K Line Bill of Lading, presuming its own terms apply, includes a "Himalaya Clause" that extends limitations of liability included in the K Line Bill of Lading to all "Connecting Carriers," including Norfolk Southern. By its own terms, the K Line Bill of Lading thus limits Norfolk Southern's liability to "Merchants['] net invoice cost, plus freight and insurance premium, if paid." As under the Circular, the district court determined the merchants' net invoice cost also to be Jessica Howard's cost of acquiring the goods in Shanghai.

On March 11, 2002, the district court entered judgment in favor of Jessica Howard in the amount of $15,164.70.

### DISCUSSION

■ We review a district court's grant of summary judgment *de novo*. *See Rogers v. City of Amsterdam*, 303 F.3d 155, 158 (2d Cir.2002). The district court construes the terms of a contract as a matter of law, and we review the district court's construction *de novo*. *State Farm Fire &*

*Cas. Ins. Co. v. Sayles*, 289 F.3d 181, 185–86 (2d Cir.2002).

We hold that the district court erred in interpreting the "actual physical loss" liability provision in the Circular to require, as a matter of law, that damages be measured by Jessica Howard's cost of acquiring the goods at the point of the shipment's origin in Shanghai. We do not reach, and we remand to the district court for consideration of, the question whether the liability limitation provision in the Circular, the K Line Bill of Lading or some other document governs because the record is insufficient for us to make the determination as a matter of law.

### I. "Actual Loss" Liability Provisions Are Often Measured by Market Value at Destination

The term "actual loss" has a long history in carriers' liability provisions and has most frequently been measured by the fair market value of the lost or damaged goods at destination. The Supreme Court has noted the common law rule that "[t]he measure of the shipper's recovery is normally the market value of the goods at destination," and has described this default measure as the shipper's "actual loss" from which contractual agreements could deviate by specifying a limitation of liability to invoice value plus freight. *Ansaldo San Giorgio I v. Rheinstrom Bros. Co.*, 294 U.S. 494, 496–97, 55 S.Ct. 483, 79 L.Ed. 1016 (1935); *see also Weirton Steel Co. v. Isbrandtsen–Moller Co.*, 126 F.2d 593, 594 (2d Cir.1942) (L.Hand, J.) ("The ordinary rule is indeed that damages for injury to goods while in possession of a carrier are to be computed at the differ-

---

56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Id.* at 74. Because we vacate the district court judgment on oth-

er grounds, we do not decide whether the district court properly adopted the $15,164.70 figure.

ence between the sound market value at destination and the value as damaged.").

Courts have also consistently interpreted statutory provisions that refer to loss during shipping as referring to the value of the goods at destination. In *Chicago, Milwaukee & St. Paul Railway v. McCaull–Dinsmore Co.*, 253 U.S. 97, 40 S.Ct. 504, 64 L.Ed. 801 (1920), the Supreme Court not only interpreted a federal statute requiring rail carriers to be liable "for any loss, damage, or injury to ... property" to measure damages at the point of destination but also held that a private contract specifying damages "computed ... at the place and time of shipment" was contrary to the mandatory term imposed by the statute. *Id.* at 98–99, 40 S.Ct. 504. The Carriage of Goods by Sea Act caps a carrier's liability at "the amount of damage actually sustained," 46 U.S.C. § 1304(5), a phrase that courts have interpreted ordinarily to measure damages at "the market price of the cargo at the place of destination ... on the date when it should have arrived." *Holden v. S.S. Kendall Fish*, 262 F.Supp. 862, 864, 866 (E.D.La.1966) ("[W]hat is 'damage actually sustained?' This Court, without any hesitation, answers: damage computed on the basis of the fair market value of the goods at destination as of the date of arrival."), *aff'd* 395 F.2d 910 (5th Cir.1968). Similarly, the Second Circuit has stated that the provisions of the Carmack Amendment, a federal statute regulating rail carriers' liability and imposing liability for "actual loss or injury to the property," 49 U.S.C. § 11706, were "generally ... based on the fair market value" of the goods. *Project Hope v. M/V IBN SINA*, 250 F.3d 67, 77 (2d Cir.2001). For this proposition, we relied on *Contempo Metal Furniture Co. v. East Texas Motor Freight Lines, Inc.*, 661 F.2d 761, 764 (9th Cir.1981), a case that measured the fair market value at destination. *See also Neptune Orient Lines, Ltd. v. Burlington*

*N. & Santa Fe Ry.*, 213 F.3d 1118, 1120 (9th Cir.2000) ("[W]hen the property does not arrive at all, [under the Carmack Amendment] we are left to determine its market value at the destination had it arrived safely.").

## II. The Circular Does Not Foreclose This Common Meaning of "Actual Loss"

▮ The language in the Circular surrounding the phrase "actual physical loss" does not prevent the phrase from having its ordinary shipping-contract meaning. First, measuring "actual physical loss" by the fair market value of the goods at destination does not render the Carmack and Standard provisions redundant. While the Carmack provisions do limit a carrier's liability to the property's value at destination (as discussed above), the Standard provisions further limit the carrier's liability to "the lesser of the destination value of the cargo or $250,000." Additionally, because the Carmack and Standard provisions differ in terms other than those limiting liability, the election of the Carmack terms could still have value to a shipper of goods even if the liability loss terms were identical. For example, the Carmack Amendment permits the imposition of joint and several liability, *see Project Hope*, 250 F.3d at 76, but the Standard liability provisions limit Norfolk Southern's liability to "that portion of the loss or damaged caused by [Norfolk Southern's] carrier negligence."

Second, the Circular's exclusion of consequential damages does not foreclose liability for lost profits to the extent those profits merely reflect the value of the goods at destination. Numerous shipping cases describe the fair market value at destination of goods lost or damaged in transport as the equivalent of general, expectation or ordinary contract damages

rather than as consequential damages. *See, e.g., Chicago, Milwaukee & St. Paul Ry.*, 253 U.S. at 100 (stating the value of goods at destination compensates for "the actual loss caused by breach of a contract" or "the loss of what the contractee would have had if the contract had been performed"); *Seguros Banvenez, S.A. v. S/S Oliver Drescher*, 761 F.2d 855, 860–61 (2d. Cir.1985) (stating that in admiralty law "[t]he correct measure of damages . . . is the amount necessary to put the injured parties in the exact position they would have been in had there been no breach," which "[i]n loss of cargo cases . . . generally means the market value of the goods at the time and place they were to have been delivered").

In *Neptune Orient Lines*, the Ninth Circuit held that measuring the liability of a rail carrier by the fair market value of the goods shipped at the point of destination does not award consequential damages. 213 F.3d at 1120. The dispute in *Neptune Orient Lines* centered on the liability of a rail carrier, Burlington Northern, under the Carmack Amendment for a lost shipment of Nike shoes:

> Burlington claims that Nike's actual loss is only the price [Nike] paid to the manufacturer [at the origin of the shipment]. Burlington argues that any amount in excess of the price paid to the manufacturer violates the rule established by *Hadley v. Baxendale*, which states that special or consequential damages are not recoverable unless the party was on notice of those special damages at the time of contracting. Burlington cites a long line of cases holding that "lost profits" are not recoverable as special damages. However, as the district court correctly pointed out, each of those cases essentially involves "lost *productivity*." *Hadley v. Baxendale* and the lost productivity cases cited by Burling-

ton do not address the question before this court.

> The question presented to us is whether the amount characterized as "lost markup" by Burlington is correctly viewed as part of the "actual loss." We hold that it is. "Market value at destination" is the proper measure of the actual loss in a situation where, as here, the shipment is lost or destroyed.

*Id.* (internal citations omitted).

■ We agree with the Ninth Circuit. A profit derived from the difference between a good's cost at origin and fair market value at destination is not the type of lost profit classified as consequential damages in a shipping contract. " 'Special damages' (consequential damages) are measured, not by the value of the promised performance alone but by the gains such performance could produce for collateral reasons, or the loss that is produced by the absence of such performance." Dobbs, 3 Law of Remedies § 12.1(1). The market price at destination of the goods shipped is a measure of the "value of the promised performance," and is not "collateral" to the contract to ship the goods to that destination. *See also id.* § 12.2(3) ("[S]ome writers might use the term 'lost profit' to describe the loss of expected market gain in the very performance promised. This usage may tend to confuse general and special damages, however.").

### III. The Limited Nature of Our Holding

Our holding on the liability provision in the Circular is limited: we hold only that the district court erred in determining that *on the basis of contract interpretation* Jessica Howard's damages must, *as a matter of law*, be measured by the goods' acquisition cost in Shanghai. We do not reverse the district court or hold that "actual physical loss" must, as a matter of law, be the

value of the goods at destination. Furthermore, if the district court determines that the liability limitation provision of the Circular applies, it may even decide, after a bench trial and in light of its findings of fact, that the proper measure of damages to compensate for Jessica Howard's "actual physical loss" is the amount Jessica Howard paid for the goods in Shanghai. *Cf. Project Hope*, 250 F.3d at 77 ("While it is true that damages under the Carmack Amendment should generally be based on the fair market value, we have held that it need not be applied if 'circumstances suggest a more appropriate alternative.'" (quoting *Thyssen, Inc. v. S/S Eurounity*, 21 F.3d 533, 540 (2d Cir.1994))); *Weirton Steel Co.*, 126 F.2d at 594 ("The ordinary rule is indeed that damages for injury to goods while in possession of a carrier are to be computed at the difference between the sound market value at destination and the value as damaged. That is obviously the right measure where the consignee buys the goods for resale which is the ordinary case; but at times it works out to give him more than indemnity, and when it does, the courts have refused to adopt it." (internal citations omitted)). For example, if Jessica Howard had a sufficient inventory of the goods in New Jersey so as not to have lost any sales, replacement cost might be "an appropriate measure of damages where [Jessica Howard] could mitigate the loss by replacing the goods." *Neptune Orient Lines*, 213 F.3d at 1120. Such a decision on the appropriate measure of damages, when based on findings of fact rather than solely on the construction of a contract, would be reviewed only for abuse of discretion. *See Project Hope*, 250 F.3d at 77.

### CONCLUSION

Based on our interpretation of the Circular, we hold that the district court erred in determining that, as a matter of law, the

potentially operative documents all measure Norfolk Southern's liability by Jessica Howard's cost of acquiring the lost goods in Shanghai. The record is not sufficiently developed for this Court to address which document controls Norfolk Southern's liability or, if it were to govern, which liability provision the K Line Bill of Lading incorporates. Nor have the parties briefed these questions completely. We therefore remand to the district court for further proceedings to determine the document and the provision governing Norfolk Southern's liability, the extent of that liability, and any other matters related to these proceedings.