Filed 10/9/25  Legacy Transportation Services v. Landstar Ranger CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| LEGACY TRANSPORTATION SERVICES, INC., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> LANDSTAR RANGER, INC., <br><br> Defendant and Appellant. | B342832 <br><br> (Los Angeles County Super. Ct. No. 23LBCV01005) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Affirmed in part, reversed in part.

Stone Dean, Gregg S. Garfinkel and Leslie A. Blozan for Defendant and Appellant.

Roberts & Kehagarias and Andrew D. Kehagarias for Plaintiff and Respondent.

\* \* \* \* \* \*

Through a non-exclusive contract, a transportation broker hired a shipping carrier to ship goods for the broker's customers; the contract prohibited the carrier from using subcontractors to ship goods.  In breach of the contract, the carrier hired a subcontractor to ship a load of batteries, and the subcontractor got into a vehicular accident.  The broker sued the carrier for the cost of the customer's damaged goods *and* the cost of towing the subcontractor's truck.  The trial court granted summary judgment for the broker and awarded all of its sought-after damages.  We reject the carrier's argument that the broker's overall damages are capped at $150,000, but agree that the contract's bar against the recovery of consequential damages prohibits recovery of the towing costs.  We accordingly affirm in part and reverse in part.

### FACTS AND PROCEDURAL BACKGROUND

I.    **Facts**[1]

A.    ***The contract***

Legacy Transportation Services, Inc. (Legacy) is a federally licensed "property broker" that contracts with licensed motor carriers to transport its customers' cargo across state lines.[2]

---

[1]    We draw the facts from the contract at issue in this case and from the parties' stipulations of fact.

[2]    Under federal law, the term "broker" is defined as "a person, other than a motor carrier . . ., that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or

Landstar Ranger, Inc. (Landstar) is one of those licensed motor carriers.[3]

On May 22, 2019, Legacy entered into a non-exclusive[4] "Transportation Brokerage Agreement" (the agreement) pursuant to which Landstar would "provide motor transportation services" for Legacy's customers. Pertinent provisions of the agreement include:

-- *General prohibition against subcontracting transport.* Section 11 prohibits Landstar from "re-broker[ing], co-broker[ing], subcontract[ing], assign[ing], interlin[ing], or transfer[ing] the transportation of shipments" to any other carrier without Legacy's "prior written consent." Along the same lines, section 22 prohibits Landstar from "delegating" its transportation obligations "to any third parties (such as sub-haulers . . .)" without Legacy's "express written consent."

-- *Cap on damages for goods "maintain[ed]" under Landstar's "sole and exclusive care, custody, and control."* Section 16 requires Landstar to "maintain the sole and exclusive care, custody, and control" of customers' cargo from the time that cargo "is delivered to [Landstar] for transportation" until the delivery is

---

arranging for, transportation by motor carrier for compensation." (49 U.S.C. § 13102(2).)

[3] Under federal law, the term "carrier" includes "a motor carrier, a water carrier, and a freight forwarder" (49 U.S.C. § 13102(3)) and, in turn, a "motor carrier" "provid[es] motor vehicle transportation for compensation" (49 U.S.C. § 13102(14)).

[4] The parties acknowledge that Legacy "will enter into similar agreements with other carriers" and that Landstar "may enter into similar agreements with other brokers and/or shippers."

complete. Section 16 also caps Landstar's liability for claims related to its transportation of cargo: Landstar is liable "for any loss, delay, damage to or destruction of any and all shipments while under [Landstar's] care, custody, and control, not to exceed $150,000 per trailer of goods . . . . [Landstar's] liability under this Agreement for any cargo claims shall be the full value of the property, meaning its replacement cost . . ., plus any additional transportation cost or incidental expenses that may be incurred by [Legacy] or its customer, as limited herein."[5]

-- *Prohibition of consequential damages.* Section 31 provides that "[n]either party shall be liable to the other to the extent damages are consequential, special, incidental, punitive or exemplary."

The agreement also sets an initial one-year term subject to automatic annual renewals. However, Legacy has the right to "immediately terminate" the agreement if Landstar's federal "safety rating" as a carrier drops to below "Satisfactory."

### B.     *The accident and Legacy's damages*

On January 27, 2022, Legacy arranged for Landstar to transport a cargo shipment of 33 electric vehicle batteries from Belleville, Michigan to Oklahoma City, Oklahoma on behalf of Legacy's customer, General Motors Company (GM). In violation of section 16 of the agreement, Landstar had another carrier perform that assignment without Legacy's consent. During the

---

[5]     The agreement also contains an indemnification clause requiring Landstar to "defend, indemnify and hold [Legacy] . . . harmless from any and all liability and/or claims arising from [Landstar's] breach of th[e] agreement." While this provision appears to be potentially applicable to the dispute in this case, the parties did not address this provision on appeal or in the trial court. Its potential applicability has accordingly been forfeited.

4

transportation, the other carrier was in an accident on a highway in Rolla, Missouri. GM's electric vehicle batteries were damaged during the accident, and Legacy had to pay GM $341,942.24 to resolve GM's claim. Legacy also spent $218,279.79 for "towing and recovery services at the scene of the [a]ccident, plus other post-[a]ccident services."

Landstar did not pay any of these alleged damages.

### C. *Landstar's unpaid transportation services*

Landstar continued to perform transportation services pursuant to the agreement. Landstar billed Legacy $254,211.98 for services performed between November 2021 and February 2022, which Legacy refused to pay.

## II. Procedural Background

### A. *The pleadings*

On June 2, 2023, Legacy filed a complaint against Landstar to recover the $560,222.03 it paid for GM's claim and for the post-accident services. Landstar filed a cross-complaint to recover the $254,211.98 in unpaid invoices for other jobs. The pleadings are not in the record on appeal, and the parties' briefs do not identify the causes of action asserted in those pleadings.

### B. *Cross-motions for summary judgment*

Legacy and Landstar both filed motions for summary judgment based on a set of stipulated facts. Landstar argued that (1) Legacy's total recovery of damages was capped at $150,000 and (2) Legacy's request for $218,279.79 in damages for post-accident costs was barred by the agreement's prohibition against consequential damages. In support of its arguments, Landstar submitted the declaration of its director of customer-contract administration.

5

Following a hearing on October 1, 2024, the trial court granted both summary judgment motions without analysis. The court entered judgment for Legacy in the full amount of its requested damages, subject to an offset in the amount of Landstar's damages.

### C.    *Appeal*

Landstar timely appealed.[6]

## DISCUSSION

Landstar argues that the trial court erred in awarding Legacy $560,222.03 because (1) the agreement caps Legacy's total damages at $150,000, (2) the agreement bars Legacy's recovery of $218,279.79 in post-accident costs because they constitute consequential damages, and (3) even if the post-accident costs are recoverable, there are triable issues of fact as to their reasonableness.

""""A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c) . . . .""" (*State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1017.) We independently review a trial court's grant of summary judgment. (*Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407, 413.) Where, as here, the summary judgment ruling turns on questions of contractual interpretation, we review those subsidiary questions de novo. (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470.) To that end, we are not bound by the trial court's construction of the

---

[6]    Landstar filed its notice of appeal following notice of the trial court's ruling but before judgment was entered. We treat as timely its premature notice of appeal. (Cal. Rules of Court, rule 8.104(d)(2).)

contract and must instead independently interpret the contract. (*Department of Forestry & Fire Protection v. Lawrence Livermore National Security, LLC* (2015) 239 Cal.App.4th 1060, 1066; *U.S. Bank National Assn. v. Yashouafar* (2014) 232 Cal.App.4th 639, 646.)

In interpreting a contract, our task is to "give effect to the mutual intention of the parties as it existed" at the time the contract was executed. (Civ. Code, § 1636.) We evaluate this intent objectively by examining the contract's terms. (*Id.* at §§ 1638, 1639; *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1125-1126.) We interpret the contract as a whole "so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.)

## I.    Legacy's Damages Are Not Subject to the Cap in Section 16 of the Agreement

We independently conclude that the $150,000 damages cap does not operate to cap Legacy's recovery in this case.

The $150,000 damages cap is contained in the second sentence of section 16, and it applies to "any loss, delay, damage to or destruction of any and all shipments *while under [Landstar's] care, custody, and control . . . .*" (Italics added.) Thus, the agreement's plain text makes clear that the cap does not apply where, as here, a shipment is *not* under Landstar's "care, custody, and control"—that is, where Landstar has placed the shipment in the "care, custody, and control" of a subcontractor. This reading of the agreement is reinforced by the multiple other provisions prohibiting Landstar from subcontracting its carrier duties as well as the provision granting Legacy an immediate right to terminate the agreement if *Landstar*'s safety rating becomes less than "Satisfactory."

7

Landstar resists this conclusion with two arguments.

First, Landstar argues that the $150,000 damages cap applies because the third sentence of section 16 states that Landstar's liability "for *any* cargo claims shall be the full value of the property . . ., plus any additional transportation cost or incidental expenses that may be incurred by [Legacy] or [GM], *as limited herein*." (Italics added.) Seizing on the language we have italicized, Landstar argues that the $150,000 "limit" applies to "any" cargo claim, even one where the cargo is transported by a subcontractor rather than Landstar itself. We reject this construction of section 16 because it ignores that the third sentence in section 16 comes after the prior two sentences, the first of which obligates Landstar to "maintain the sole and exclusive care, custody, and control of all shipments" and the second of which declares Landstar liable for the "loss, delay, damage to or destruction of" shipments "under [Landstar's] care, custody, and control"; to read the "limited herein" language in the third sentence as *expanding* the $150,000 cap to apply in cases in which Landstar does *not* maintain the "care, custody, and control" of a shipment is to effectively negate the effect of that limiting language in the earlier sentences. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264-1265 [contractual language must be interpreted "in context"]; *Legacy Vulcan v. Superior Court* (2010) 185 Cal.App.4th 677, 688 [we "interpret [a contract's] language in context so as to give effect to each provision, rather than interpret contractual language in isolation"].) What as more, the contract as a whole was designed to have Landstar and Landstar alone serve as the carrier, and to recognize Landstar's safety record with a reasonable cap on damages; extending that cap to instances in which Landstar was

8

not the carrier effectively rewards Landstar notwithstanding its breach of a central premise of the agreement. (See *ASP Properties, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1269 ["Interpretation of a contract 'must be fair and reasonable, not leading to absurd conclusions. [Citation.]"].)

Second, Landstar argues that agreement is latently ambiguous on this point, and that the uncontradicted parol evidence it submitted—namely, the declaration of its director of customer-contract administration—resolves the ambiguity in favor of the $150,000 cap applying even when Landstar breached the agreement by subcontracting because the director stated that (1) his "primary focus" and "major concerns" in negotiating the agreement was ensuring that Legacy's liability was "predictable and limited" "regardless of the circumstances of a cargo loss," (2) he negotiated section 16 of the agreement "to deal with" a situation like the one here, and (3) the "intent" behind the phrase "as limited herein" in the third sentence of section 16 was to subject *all* cargo claims to the $150,000 damages cap. We reject this argument because the contract is not, in our view, ambiguous. We also reject this ambiguity-based argument because the declaration is inadmissible.[7] For starters, the director addresses *his* subjective motivation and intent in negotiating section 16 of the agreement, but the uncommunicated subjective intent of a party is irrelevant because we are tasked with examining the objective intent of both parties. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166, fn. 3; *G & W Warren's, Inc.*

---

[7] Although the trial court did not rule on Legacy's objections to the declaration (such that we must presume it was admitted (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534)), Legacy's renewed evidentiary objections on appeal are well taken.

*v. Dabney* (2017) 11 Cal.App.5th 565, 575; *Great American Ins. Co. v. Superior Court* (2009) 178 Cal.App.4th 221, 239, fn. 22.) And to the extent the director is offering his expert opinion governing interpretation of the agreement, that opinion constitutes an improper legal conclusion. (*City of Rocklin v. Legacy Family Adventures-Rocklin, LLC* (2022) 86 Cal.App.5th 713, 728-729; *In re Tobacco Cases I* (2010) 186 Cal.App.4th 42, 51.)

## II. Legacy Is Barred by Section 31 of the Agreement from Recovering the Post-Accident Costs

We independently conclude that Legacy's recovery of $218,279.79 for post-accident costs is barred by section 31's exclusion of recovery for consequential damages. Damages for breach of contract generally reach "the amount which will compensate . . . for all the detriment proximately caused thereby . . . ." (Civ. Code, § 3300.) Those damages ordinarily include (1) general damages, which are damages that "flow directly and necessarily from a breach of contract" (*Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 968) and (2) consequential damages, which are damages that "do not arise directly and inevitably" but which are recoverable to the extent they "were either actually foreseen . . . or were 'reasonably foreseeable' when the contract was formed" (*Id.* at p. 970; see also *Stevens Group Fund IV v. Sobrato Development Co.* (1991) 1 Cal.App.4th 886, 892). (See generally *Mission Beverage Co. v. Pabst Brewing Co., LLC* (2017) 15 Cal.App.5th 686, 710-711.) However, contractual waivers of consequential damages are valid (subject to exceptions not relevant here). (*Markborough California, Inc. v. Superior Court* (1991) 227 Cal.App.3d 705, 714 [limitation of liability clauses

"have long been recognized as valid in California"]; but see Civ. Code, § 1668.)

The court erred in allowing Legacy to recover the $218,279.79 for towing and other post-accident costs because section 31 constitutes an express waiver of consequential damages and because the towing and post-accident costs Legacy sought to recover qualify as consequential damages, as those cost items did not "flow directly and necessarily from" the injury to the shipped cargo or Landstar's breach of the non-assignment provision; cargo may be injured and the non-assignment may be breached without an accident, such that accident-related costs, while certainly foreseeable, do not "arise directly and inevitably" from breach of the agreement.

Legacy resists this conclusion with two arguments.

First, Legacy points to the third sentence of section 16, which declares Landstar liable for "the full value of the property, meaning its replacement cost . . . *plus any additional transportation cost or incidental expenses* that may be incurred by [Legacy] or its customer, <u>as limited herein</u>," and goes on to argue that the italicized language is a specific authorization of the post-accident costs here and that it trumps the more general prohibition against such consequential damages in section 31. Although specific provisions of a contract typically trump more general provisions (Code Civ. Proc., § 1859; *Iqbal v. Ziadeh* (2017) 10 Cal.App.5th 1, 12), we reject Legacy's argument because it ignores the "as limited herein" language in section 16 (underlined above), which makes specific authorization of "additional transportation cost or incidental expenses" explicitly subordinate to the general prohibition against consequential damages set forth in section 31.

11

Second, Legacy argues that consequential damages are essentially limited to "lost-productivity" damages and the costs of post-accident services here do not meet that definition, such that section 31's bar on consequential damages is inapplicable. For support, Legacy cites *Neptune Orient Lines, Ltd. v. Burlington Northern and Santa Fe Ry. Co.* (9th Cir. 2000) 213 F.3d 1118, 1120 (*Neptune*). We reject Legacy's argument. *Neptune* did not purport to create an across-the-board limitation on the scope of consequential damages; instead, *Neptune* addressed the question of whether the "lost markup" on damaged cargo (that is, the difference between the market value of the lost cargo and its replacement cost) constituted "actual loss" *to the cargo* recoverable as general damages. (*Id.* at pp. 1119-1120.) *Neptune* has nothing to do with accident clean-up costs.

\*     \*     \*

In light of our conclusion, we have no occasion to reach Landstar's further arguments regarding the reasonableness of the amount of post-accident services costs.

## DISPOSITION

The judgment is reversed in part. The award of $218,279.79 to Legacy for "towing and recovery services . . ., plus other post-[a]ccident services" is reversed. The judgment is affirmed in all other respects. The parties are to bear their own costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, P. J.

HOFFSTADT

12

We concur:

_____, J.
  MOOR


_____, J.
  KIM (D.)